**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN**

| | |
|---|---|
| Joseph Vazquez, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>       - against -<br><br>Snyder's-Lance, Inc.,<br><br>                Defendant | 1:22-cv-00026<br><br><br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.    Snyder's-Lance, Inc. ("Defendant") manufactures, labels, markets, and sells "Whole Grain Sandwich Crackers" with Peanut Butter, promoted with statements including "11g Whole Grain" and "4g Protein" under its Lance brand ("Product").




## I. CONSUMERS VALUE WHOLE GRAINS

2. Consumers increasingly prefer whole grains to non-whole grains.

3. Whole grains are nutritionally superior to non-whole grains because they include the entire grain seed, consisting of the endosperm, bran, and germ.

4. The bran and germ contain important nutrients like fiber, vitamins, minerals, and antioxidants, such as iron, zinc, folate, magnesium, thiamin, niacin, selenium, riboflavin, manganese, copper, vitamin A, and vitamin B6.

5. In contrast, "non-whole grains" or "refined grains" have been processed to remove the bran and germ, thereby removing the fiber and most other nutrients.

6. Most refined grains are enriched, a process that adds back some of the previously removed iron and B vitamins, such as thiamin, riboflavin, niacin, and folic acid.

7. Other nutrients, including fiber, vitamin E, vitamin B6, vitamin K, magnesium, manganese, potassium, phosphorus, copper, calcium, and selenium, are not added back.

8. Where flour is made of refined grains, which only contains the endosperm and mainly starch, it is white in color ("white flour").

9. The 2015-2020 Dietary Guidelines for Americans recommend that at least half of all grains eaten be whole grains.

10. The Dietary Guidelines recommend consuming 48g of whole grains per day.

A. Consumers Expect Fiber From Whole Grains

11. The average person needs 28 grams of fiber per day.

12. Dietary Guidelines promote whole grains as an important source of fiber.

13. 87% of consumers try to consume more whole grains and 92% try to get more fiber.

14. Research proves that consumers seek whole grains because they want more fiber.

15. In surveys, more than 60% of consumers stated they want to consume more whole grains to improve their digestive health, which is reflective of a desire to increase fiber intake.

16. Almost 75% of consumers who are presented front label claims that a product is made with, or contains whole grains, will expect that food to be at least a good source of fiber – 10% of the daily value.

17. Almost 70% of consumers agree with the statement that whole grains are one of the best sources of fiber.

18. 62% of consumers agree that foods made from whole grains are one of the best sources of fiber.

19. 46% of consumers rely on foods with whole grains for their daily fiber needs.

20. Based on the proven connection with fiber, whole grain statements do more than tell consumers a product contains a type of grain ingredient.

21. At least half of consumers expect that for every gram of whole grain per serving, there will be at least a gram of fiber.

22. The survey revealed that almost half of consumers who viewed the Product's claim of 11 grams of whole grains expect it to provide at least 11 grams or more of fiber.

23. However, the Product does not contain 11 grams of fiber, but 2 grams, or 8% of the daily value, per serving, which misleads consumers.



B. Labeling Whole Grain Claims

24. The Product states, "11g WHOLE GRAIN."

25. However, this does not tell consumers the percent of the grain that is refined compared to whole.

26. The front label does not disclose the percentage of whole grains compared to the 48g whole grains the dietary guidelines recommend.

27. Even if consumers review the ingredients, listing "WHOLE WHEAT FLOUR" ahead of "ENRICHED FLOUR," this does not disclose the percent of refined and whole grains.

4

**INGREDIENTS:** WHOLE WHEAT FLOUR, ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE, RIBOFLAVIN, FOLIC ACID) PEANUT BUTTER (ROASTED PEANUTS), SUGAR VEGETABLE OIL (PALM, SOYBEAN AND/OR CANOLA) DEXTROSE, LEAVENING (SODIUM BICARBONATE AMMONIUM BICARBONATE, MONOCALCIUM PHOSPHATE), CORNSTARCH, SALT, SOY LECITHIN CARAMEL COLOR, WHEAT BRAN, WHEY (MILK).

**INGREDIENTS:** WHOLE WHEAT FLOUR, ENRICHED FLOUR (WHEAT FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE, RIBOFLAVIN, FOLIC ACID), PEANUT BUTTER (ROASTED PEANUTS), SUGAR, VEGETABLE OIL (PALM, SOYBEAN AND/OR CANOLA), DEXTROSE, LEAVENING (SODIUM BICARBONATE, AMMONIUM BICARBONATE, MONOCALCIUM PHOSPHATE), CORNSTARCH, SALT, SOY LECITHIN, CARAMEL COLOR, WHEAT BRAN, WHEY (MILK).

28. "11g Whole Grain" does not tell consumers how much of a serving's weight is attributable to grain content, compared to the Product's refined grains and other ingredients.

29. Since refined grains are more prevalent in foods, consumers will look to products with "whole grain" claims to make up for their deficits in whole grains.

30. However, because the Product contains only a miniscule amount more of whole grain than refined grain, they will not successfully make up that deficit by consuming the Product.

31. The result is consumers unknowingly consume more of the Product to get more whole grains, even though they will end up consuming excess refined grains.

32. The FDA cautioned companies against misleading consumers as to whole grain content of foods.

33. When asked if "whole grain" means the same as "100 percent whole grain," the Food and Drug Administration ("FDA") stated that because it "has established standards of identity for

5

various types of cereal flours and related products in 21 CFR Part 137, including a standard of identity for 'whole wheat flour' (§ 137.200) and 'whole durum flour' (§ 137.225)," consumers are likely to expect 100% whole grains, due to their familiarity with these whole grain flours.

34. The FDA stated that, "[D]epending on the context in which a 'whole grain' statement appears on the label, it could be construed as meaning that the product is '100 percent whole grain.'"

35. The recommendation of the FDA was that products labeled with unqualified whole grain claims or 100% whole grain claims not contain non-whole grains.

36. The FDA has warned companies against making misleading whole grain representations in product names, such as "HiHo Deluxe WHOLE WHEAT Crackers" and "Krispy WHOLE WHEAT Saltine Crackers," where the products were not entirely whole grain.

37. The Federal Trade Commission ("FTC") agreed and recognized that "[M]any reasonable consumers will likely understand 'whole grain' [claims] to mean that all, or virtually all, of the food product is whole grain, or that all of the grain ingredients in the product are whole grains.

38. By highlighting the Product's whole grains through the statement, "WHOLE GRAIN SANDWICH CRACKERS," and "11g WHOLE GRAIN," consumers are misled to expect a greater absolute and relative amount of whole grains than they receive.

39. This is because even though the Product contains more whole grains than refined grains, the relative difference between these two flour types is very small, or insignificant.

C. Added Caramel Color Furthers Impression Product Contains More Whole Grains

40. Consumers associate darker hues in grain products with significant amounts of whole grain ingredients.

41. The Product contains "CARAMEL COLOR," shown on the ingredient list.

42. The Product's color would be significantly lighter if based solely on the ratio of refined grains to whole grains.

43. This caramel color contributes to consumers getting the misleading impression the Product contains more whole grains, relative to refined grains, than it does.

## II. CONCLUSION

44. The Product contains other representations which are misleading.

45. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

46. The value of the Product that Plaintiff purchased was materially less than its value as represented by defendant.

47. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

48. Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

49. The Product is sold for a price premium compared to other similar products, for no less than $1.49 per six cracker sandwiches, 1.5 oz (43g), a higher price than it would otherwise be sold for, absent the misleading representations and omissions.

### Jurisdiction and Venue

50. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

51. The aggregate amount in controversy exceeds $5 million, including any statutory

damages, exclusive of interest and costs.

52. Plaintiff Joseph Vazquez is a citizen of New York.

53. Defendant Snyder's-Lance, Inc., is a North Carolina corporation with a principal place of business in Charlotte, Mecklenburg County, North Carolina

54. Defendant transacts business within this District through sale of the Product to residents via third-party retailers and the internet.

55. Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District.

56. Venue is in Brooklyn in this District because a substantial part of the events or omissions giving rise to the claim occurred in Queens County, i.e., Plaintiff's purchase of the Product and his awareness of the issues described here.

### Parties

57. Plaintiff Joseph Vazquez is a citizen of Flushing, Queens County, New York.

58. Defendant Snyder's-Lance, Inc., is a North Carolina corporation with a principal place of business in Charlotte, North Carolina, Mecklenburg County.

59. Defendant is one of the largest sellers of crackers in the nation.

60. For over 100 years, consumers have relied on Defendant to sell them nutrient-rich foods, fairly priced.

61. Defendant is a large corporation, yet until recently was controlled by the founding Lance family, who did not cut corners when selling foods to consumers.

62. At some point, Defendant was sold to a multinational conglomerate, which had less of a connection to the company's origins, and its honest practices.

63. For almost a century, consumers were confident that what the Lance label said was

to be trusted, and would be based on facts, not half-truths or misrepresentations.

64. Lance is a brand with a significant amount of goodwill, trust and equity when it comes to consumer purchasing.

65. The Product is available to consumers from third parties, including grocery stores, drug stores, big box and club stores, convenience stores, and online, throughout this District.

66. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including ShopRite, 133-11 20th Ave, Queens, NY 11356 between November and December 2021, among other times.

67. Plaintiff did not know that the Product contained only a miniscule amount more of whole grains than refined grains.

68. Plaintiff understood the front label claims of whole grains to mean the Product's grains were all whole grains, instead of almost half being refined grains.

69. Plaintiff bought the Product because he expected it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did because that is what the representations said and implied.

70. Plaintiff relied on the words and images on the Product, on the labeling, statements, and/or claims made by Defendant in digital, print and/or social media, which accompanied the Product and separately, through any in-store marketing.

71. Plaintiff was aware of Defendant's long history of selling salted snacks, and its transparency, and honesty, through its extensive marketing and advertising.

72. Plaintiff was disappointed because the Product failed to contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

73. Plaintiff bought the Product at or exceeding the above-referenced price.

74. Plaintiff would not have purchased the Product if he knew the representations and omissions were false and misleading or would have paid less for it.

75. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components.

76. The Product was worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

77. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

78. Plaintiff is unable to rely on the labeling and representations about the issues described here for not only this Product, but other similar products, because he is unsure of whether those representations are truthful.

## Class Allegations

79. Plaintiff seeks certification under Fed. R. Civ. P. 23(b)(2) and (b)(3) of an:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and a
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Michigan, Iowa, Rhode Island, Georgia, North Dakota, Texas, New Mexico, Virginia, New Hampshire, South Dakota, and Oklahoma, who purchased the Product during the statutes of limitations for each cause of action alleged.

80. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

81. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

82. Plaintiff is adequate representative because his interests do not conflict with other members.

83. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

84. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

85. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

86. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

<u>(Consumer Protection Statute)</u>

87. Plaintiff incorporates by reference all preceding paragraphs.

88. Plaintiff and class members desired to purchase a product that contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

89. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

90. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

91. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

92. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

93. Plaintiff relied on the representations that the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

94. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

95. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

96. Defendant intended that each of members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

97. As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the other members of the Consumer Fraud Multi-State Class, have sustained damages in an amount to be proven at trial.

98. In addition, Defendant's conduct showed motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

99. The Product was manufactured, identified, and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

100. Defendant directly marketed the Product to consumers through its advertisements

and partnerships with other entities, through various forms of media, on the packaging, and in print circulars.

101.  Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

102.  Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did

103.  Defendant's representations affirmed and promised that the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

104.  Defendant described the Product as one which contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

105.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

106.  This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high quality products.

107.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers, and their employees.

108.  Plaintiff hereby provides notice to Defendant that it has breached the express and implied warranties associated with the Product.

109. Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

110. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

111. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the container or label.

112. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, and he relied on Defendant's skill or judgment to select or furnish such a suitable product.

113. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

114. Defendant had a duty to truthfully represent the Product, which it breached.

115. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company known for its high quality products.

116. Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to transparency and putting its customers first.

117. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

118. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

119. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

120. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Fraud

121. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

122. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and/or constructive knowledge of the falsity of the representations.

123. Defendant knew of the issues described here yet did not address them.

124. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

## Unjust Enrichment

125. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: January 3, 2022

    Respectfully submitted,

    Sheehan & Associates, P.C.
    /s/Spencer Sheehan
    60 Cuttermill Rd Ste 409
    Great Neck NY 11021
    Tel: (516) 268-7080
    spencer@spencersheehan.com